IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PAMELA J. LANHAM,**                              Case No. 5:16 CV 1204

      Plaintiff,                              Chief Judge Patricia A. Gaughan

      v.                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                              REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Pamela J. Lanham ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated May 19, 2016). Following review, the undersigned recommends the Court reverse and remand the Commissioner's decision.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for benefits in October 2012, alleging disability as of April 20, 2012[1]. (Tr. 175-79, 180-87). The claims were denied initially (Tr. 111, 120) and on reconsideration (Tr. 129, 135). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at an administrative hearing on January 30, 2015. (Tr. 31-62). Following the hearing, an

---

1. Plaintiff initially alleged a disability onset date of September 1, 2007 (Tr. 63, 73), but later, at the hearing, amended it to April 20, 2012 (Tr. 34, 37-38).

administrative law judge ("ALJ") issued an unfavorable decision finding Plaintiff not disabled. (Tr. 13-26). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff filed the instant action on May 19, 2016. (Doc. 1).

## FACTUAL BACKGROUND

<u>Personal and Vocational Background</u>

Plaintiff was born on December 27, 1960 (Tr. 63). At the time of the hearing, she was divorced, with two adult children. (Tr. 37-38). She has a 12th grade education and has past relevant work as a photograph retoucher and office helper. (Tr. 56, 71).

<u>Relevant Evidence</u>

On April 20, 2012, Plaintiff went to the emergency room complaining of difficulty breathing. (Tr. 346). She was diffusely wheezing throughout all lung fields and did not appear distressed. *Id.* Plaintiff was able to talk and converse throughout her entire visit. *Id.* She was treated with albuterol treatments, Benadryl, Solu-Medrol, Zofran, and Pepcid. *Id.* Plaintiff had a "large amount of relief", her breath sounds improved, and eventually she had no wheezing or nausea. *Id.* She felt "markedly improved" and wanted to go home. *Id.* Upon discharged, she was diagnosed with an "allergic reaction". *Id.*

Plaintiff again went to the emergency room on May 24, 2012, with lip swelling. (Tr. 281). The night before she felt as though her throat was closing, but improved with Benadryl. *Id.* A physical examination revealed swelling of her upper and lower lips, no tongue swelling, no wheezing, no rash, clear lungs, no focal neurologic deficits, no pedal edema, and she spoke clearly. *Id.* Her lip swelling increased and the physician felt "her airway is going to have to be secured"; however, because it was "after hours" at the hospital there was not an anesthesiologist available.

*Id.* Due to Plaintiff's obesity and small mouth opening, the emergency room physician did not feel comfortable doing it himself, so Plaintiff was transferred to another hospital. (Tr. 281-82). Plaintiff was admitted to Akron General Health System from May 24 to May 25, 2012. (Tr. 323). Upon discharge, she was diagnosed with an allergic reaction with angioedema with no clear etiology. (Tr. 332).

On June 4, 2012, Plaintiff sought follow-up treatment. (Tr. 359). She reported "over the past two years she . . . had a waxing and waning course with swelling of hands and feet and more recently lips and tongue" which "ha[d] been fairly sporadic without any obvious triggers." *Id.* Physical findings were unremarkable. *Id.* Plaintiff reported "significant insomnia related to prednisone use." *Id.* Therefore, the doctor decided to "[w]ean prednisone" and start Plaintiff on Atarax. *Id.* She was diagnosed with "[r]ecurrent angioedema, likely autoimmune type", "[l]ow C4", "[a]llergic rhinitis", and "[i]nsomnia, secondary to prednisone." *Id.* Laboratory work dated July 11, 2012, showed a C1 esterase inhibitor of 9, with a normal range being 21-39. (Tr. 360).

In a treatment note dated October 3, 2012, Mark Pluskota, D.O., noted Plaintiff had been diagnosed with hereditary angioedema and had experienced two episodes that were "both cleared up [with] Epinephrine." (Tr. 369). An examination revealed Plaintiff's general appearance was pleasant and in no acute distress. *Id.* She had no edema in her lower legs; no rash; clear lungs with no crackles or wheezes; normal motor strength; and normal gait. *Id.* A few months later, on December 16, 2012, Dr. Pluskota stated in a letter addressed "To Whom It May Concern": "There is no evidence to support disability at this time." (Tr. 363).

On June 13, 2013, Plaintiff was seen for a sore throat, shortness of breath, difficulty swallowing, and facial swelling. (Tr. 406). It was noted she had experienced three angioedema episodes over the last three years. *Id.* A physical examination revealed she was in moderate

respiratory distress, but had no tongue or oropharynx edema. (Tr. 413). Her lungs were clear; she had no edema; she had normal speech; and an intact range of motion in all four extremities. (Tr. 413-14). There was some inspiratory stridor. (Tr. 413). The notes reveal Plaintiff " improved significantly" on epinephrine, Benadryl, and Pepcid. (Tr. 414). She was diagnosed with angioedema and pharyngitis. *Id.*

Plaintiff had a follow-up appointment on August 1, 2013. (Tr. 433-35). A physical examination revealed normal findings and Plaintiff appeared to be in no acute distress. *Id.* She was assessed with anxiety disorder, depression, and hereditary C1-esterase inhibitor deficiency. (Tr. 435).

The same month, on August 19, 2013, Plaintiff saw Ravi Karnai, M.D. (Tr. 440). Plaintiff reported facial swelling, lip and throat swelling, shortness of breath, abdominal pain, and arm redness and swelling. *Id.* Plaintiff stated she experienced one to three episodes per month, each lasting between three and four days. *Id.* Dr. Karnai diagnosed Plaintiff with gastroesophageal reflux disease, angioneurotic edema, and abdominal pain. (Tr. 441). He prescribed Pepcid, Benadryl, and epinephrine; and continued Firazyr. (Tr. 441-42).

Plaintiff went to the emergency room on June 22, 2014, complaining of a productive cough for two days, wheezing, and shortness of breath. (Tr. 460). She had no chest pain, palpitations, dizziness, fever, chills, nausea, or vomiting. *Id.* She was in no acute distress, and did not have a sore throat, facial swelling, or rash. (Tr. 460-61). She was diagnosed with acute bronchitis (Tr. 459) and treated with albuterol and steroids (Tr. 460). The physician recommended hospital admission for further nebulizer treatment and observation, but Plaintiff refused, stating "she has an elderly mother to take care of". *Id.*

Treatment notes from a July 3, 2014 appointment, show Plaintiff had "diffuse abdominal pain [due to] her hereditary angioedema, relieved by taking one tab of tramadol as needed." (Tr. 451).

On August 1, 2014, Plaintiff saw Robert Radin, M.D. (Tr. 448). Plaintiff reported attacks of severe abdominal pain of 10/10. *Id.* Dr. Radin noted Plaintiff stated she was unable to work due to the "frequency and severity of attacks." *Id.* Dr. Radin diagnosed Plaintiff with hereditary angioedema and prescribed Danazol. *Id.*

On October 7, 2014, Plaintiff reported a severe attack of abdominal pain during which time she was incapacitated. (Tr. 447). Her symptoms were partially improved by Firazyr. *Id.* Her abdomen was distended and tender and she was treated with Firazyr, Danazol, Tramadol, and Phenergan. *Id.* Plaintiff also reported daily low-grade abdominal symptoms with fatigue. *Id.*

Opinion Evidence

In a letter dated October 10, 2014, Dr. Radin described Plaintiff's condition as a "rare and potentially life-threatening genetic condition", characterized by a "defect in the production of inadequate or non-functioning C1 esterase inhibitor . . . a protein that helps regulate the body's inflammatory system." (Tr. 449). He noted Plaintiff suffered from "severe attacks of abdominal pain caused by intestinal swelling" which were incapacitating and usually lasting "more than a day or two." *Id.* Dr. Radin noted Plaintiff low-grade adnominal symptoms and fatigue between attacks; nausea, vomiting; and facial and extremity swelling. *Id.* He also noted Plaintiff described her pain as a 10/10, and added there was no cure for her disorder only treatment to help alleviate symptoms. *Id.* Dr. Radin concluded Plaintiff was "unemployable". *Id.*

After a follow-up appointment on February 10, 2015, Dr. Radin wrote another letter. (Tr. 480). He noted that during his career, he had treated 45 patients for hereditary angioedema, some

of whom were able to work "since they only have [two] or [three] attacks per year", but saw "too many patients that are unable to work due to the frequency and severity of their attacks." *Id.* He added he knew of two deaths caused by the condition. *Id.* Dr. Radin noted the medication Danazol did not stop Plaintiff's attacks, and noted she had experienced twenty such attacks since the previous October which were worse around her menstrual cycle. *Id.* He stated: "[Plaintiff] has been disabled up to [five] days with abdominal swelling and pain" and that "[d]ue to the severity and frequency of . . . attacks, her work attendance would be less than 50%." *Id.* He concluded: "Since there is no cure for her disorder, her only option is disability." *Id.*

<u>Hearing Testimony</u>

*Plaintiff's Testimony*

Plaintiff testified she lived with her mother (Tr. 41), for whom she had cared since 2008, and who suffered from dementia. (Tr. 39). In 2013, Plaintiff and her mother moved from Ohio to Virginia to be closer to family (Tr. 38-39), including Plaintiff's daughter and three grandchildren (Tr. 40-41). However, she stated her mother was "very low maintenance", as she slept approximately fourteen hours a day. (Tr. 40). Plaintiff's daughter would help bathe Plaintiff's mother and sometimes feed her, but other times Plaintiff was able to "manage to feed" them both. *Id.* When asked if she helps her daughter with Plaintiff's grandchildren, Plaintiff responded: "Not as much as I'd like." (Tr. 41).

When asked how many "bad days" she experienced a month, Plaintiff stated that it varied, adding: "I can go maybe four or five days without a debilitating swell and when I get those I am just down. I'm in the restroom on the toilet and I have a trashcan and I just have to wait for that to pass and watch my breathing and pray that that swell doesn't kill me." *Id.* She later estimated she experienced fifteen "bad days" a month, during which she needed to call her daughter for

assistance with daily activities. (Tr. 51-52). Plaintiff noted she "quit [her] job because [she] was afraid [she] was going to get fired, [she], [sic] missed so much work." (Tr. 41). She stated she had genital swelling during her menstrual cycle which caused her to be unable to walk. *Id.* Plaintiff underwent a procedure to alleviate the problem, but it did not help. (Tr. 41-42). She had a driver's license, and when asked how often she drove during a typical week, Plaintiff responded: "Sometimes not at all." (Tr. 42). When asked if she was able to get herself and her mother to doctor's appointments, Plaintiff stated: "I, I rarely go because I don't have insurance and my mother her doctors in Ohio have been really good about sending her, refilling her medication. So she's—went [sic] to the doctor one time and, yes, I, I managed to get her there." *Id.* Plaintiff drove to the hearing. *Id.*

Plaintiff testified she was unable to work due to "flares" and unpredictable "swells" consisting of arm and abdomen swelling following infusions. (Tr. 47). She also noted she spent long amounts of time in the restroom and experienced incontinence. *Id.* Plaintiff stated the frequency in which she administered infusions to reduce swelling in her abdomen varied, from several times a week to once every four or five days. (Tr. 48, 50). Dr. Radin had recently prescribed a new medication, but Plaintiff "[hadn't] noticed any . . . difference[]" except side effects of pain, burning, welts, nausea, lightheadedness, and occasional vomiting. (Tr. 48).

Plaintiff experienced "a lot of anxiety and depression" over her condition. (Tr. 51). She stated she "tried to take the antidepressants and I felt worse." *Id.* She was sometimes able to perform household chores, and tried to grocery shop. (Tr. 52). Plaintiff stated she experienced weight gain and fatigue. (Tr. 54-55).

*VE's Testimony*

The ALJ presented the VE three hypothetical questions based on an individual with the same age, education, and vocational background as Plaintiff. The first hypothetical was as follows:

> Assume a hypothetical individual with the past jobs you described, is capable of medium exertion, lifting, carrying, pushing and pulling 50 pounds occasionally and 25 pounds frequently, standing or walking for approximately six hours per eight-hour workday and sitting for approximately six hours per eight-hour workday with normal breaks. Never climbing ladders, ropes or scaffolds, the individual should avoid even moderate exposure to irritants such as fumes, odors, dust and gases, and the individual should avoid all exposure to unprotected heights. Can the hypothetical individual perform any of the past jobs?

(Tr. 56-57).

The VE determined the individual could perform Plaintiff's past job of officer helper, and digital photograph retoucher, but not manual retoucher. (Tr. 57).

The ALJ proceeded with the following second hypothetical:

> Okay. Now if the individual were also limited to occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling and crawling, would that change your answer?

*Id.* The VE responded that it would not. *Id.*

The ALJ continued with the third hypothetical:

> Now what if the individual were limited to, to light exertion, lifting, carrying, pushing and pulling 20 pounds occasionally and 10 pounds frequently, standing or walking for approximately six hours per eight-hour workday and sitting for approximately six hours per eight-hour workday with normal breaks. Occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling and crawling, never climbing ladders, ropes or scaffolds, avoid even moderate exposure to irritants such as fumes, odors, dust and gases and avoid all exposure to unprotected heights. Can the—this hypothetical individual perform past work?

(Tr. 57-58). The VE stated the individual could still perform Plaintiff's past work of office helper and digital photograph retoucher. (Tr. 58).

In a written decision dated April 10, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since April 20, 2012, the amended alleged onset date.

3. The claimant has the following severe impairments: hereditary angioedema, obesity, and a history of menorrhagia and endometrial polyps.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; stand or walk approximately six hours per eight-hour workday; and sit approximately eight hours per eight-hour workday with normal breaks. She can perform jobs that require occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling, and crawling. She can never climb ladders, ropes, or scaffolds. The claimant must avoid even moderate exposure to irritants such as fumes, odors, dust, and gases and she must avoid all exposure to unprotected heights.

6. The claimant is capable of performing past relevant work as an office helper and a photograph retoucher at the digital level only. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 20, 2012, through the date of this decision.

(Tr. 16-26) (internal citations omitted).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for disability benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's RFC and can claimant perform past relevant work?

5.      Can claimant do any other work considering her RFC, age, education, and
        work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

The ALJ considers the claimant's RFC, age, education, and past work experience to determine if

the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis,

including inability to do other work, and meets the duration requirements, is she determined to be

disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred by failing to: 1) consider whether Plaintiff's condition of

hereditary angioedema meet or medically equals Listing 14.06; and 2) properly assess of the

opinion of treating physician, Dr. Radin.

Listing 14.06

Plaintiff first argues the ALJ failed to sufficiently assess Plaintiff's condition of hereditary

angioedema under Listing 14.06 and asserts her condition medically equals this Listing. (Doc. 15,

at 10-14). The Commissioner responds the ALJ "adequately articulated her bases for finding that

the Listing was not met or equaled . . ." (Doc. 17, at 8), and notes substantial evidence supports

the ALJ's finding.

The Listings streamline the disability decision-making process by identifying people

whose impairments are more severe than the statutory disability standard such that their

impairments would prevent them from performing *any* gainful activity—not just substantial

gainful activity—regardless of age, education, or work experience. *Sullivan v. Zebley*, 493 U.S.

521, 532 (1990) (citing 20 C.F.R. § 416.925(a); SSR 83-19, at 90). The Listings create a

presumption of disability making further inquiry unnecessary. *Id.* Each Listing establishes medical criteria, and to qualify for benefits under a Listing, a claimant must prove his impairment satisfies all the Listing's specified medical criteria. 20 C.F.R. § 404.1525(d); *see also Zebley*, 493 U.S. at 530. It is Plaintiff's burden to establish her impairment met or equaled a Listing. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Listing 14.06, "Undifferentiated and mixed connective tissue disease", provides:

a. General. This listing includes syndromes with clinical and immunologic features of several autoimmune disorders, but which do not satisfy the criteria for any of the specific disorders described. For example, you may have clinical features of SLE and systemic vasculitis, and the serologic (blood test) findings of rheumatoid arthritis.

b. Documentation of undifferentiated and mixed connective tissue disease. Undifferentiated connective tissue disease is diagnosed when clinical features and serologic (blood test) findings, such as rheumatoid factor or antinuclear antibody (consistent with an autoimmune disorder) are present but do not satisfy the criteria for a specific disease. Mixed connective tissue disease (MCTD) is diagnosed when clinical features and serologic findings of two or more autoimmune diseases overlap.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 14.00(D)(5).

To meet the Listing a claimant must show:

A. Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

OR

B. Repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

*Id.* at Section 14.06.

Here, the ALJ specifically mentioned Listing 14.06, among others, and found that none of Plaintiff's impairments met or medically equaled a listed impairment. (Tr. 20). Her Step Three analysis, in its entirety, consisted of the following:

The claimant's physical impairments were evaluated under sections 6.00 Genitourinary System, 7.00 Hematological Disorders, 8.00 Skin Disorders, and 14.00 Immune System. These impairments are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments, Appendix 1to Subpart P, 20 CFR Part 404, giving particular attention to listing 14.06 (Exhibits 2F, 3F, 4F, 6F, 7F, and 9F).

The undersigned notes that while Ms. Lanham's hereditary angioedema, menorrhagia, and endometrial polyps are medically determinable severe impairments, they are not impairments specifically listed in Appendix 1, Subpart P, Social Security Regulations No. 4, upon which a finding of disability can be established based on medical factors alone. The evidence does not support a finding that these impairments combine with the claimant's other impairments to meet or medically equal a listed impairment[.]

Social Security Ruling 02-lp requires Administrative Law Judges to consider obesity in determining whether claimants have medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the residual functional capacity. The Clinical Guidelines issued by The National Institutes of Health define obesity as present in general where there is a body mass index (BMI) of 30.0 or above. BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m$^2$). We generally will rely upon the judgment of a physician as to whether an individual is obese.

As indicated in SSR 02-lp, obesity may have an adverse impact upon co-existing impairments. For example, obesity may affect the cardiovascular and respiratory systems, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart. Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week

or equivalent schedule. The claimant's obesity has been considered as required in this decision, but there is no evidence that her obesity combines with her other impairments to meet to medically equal a listed impairment (Exhibits 2F, 3F, 4F, 6F, 7F, and 9F).

There are no findings that may be substituted for the absent criteria in the above cited listings or in any other relevant medical listing. Therefore, the claimant's impairments do not meet or medically equal the criteria of any impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

*Id.*

Plaintiff alleges the ALJ's brief analysis is not sufficient and her conclusion is erroneous because Plaintiff's condition medically equals the Listing and should qualify as an undifferentiated mixed connective tissue disease. (Doc. 15, at 11-14). To support this proposition, she notes she suffers from the autoimmune disease hereditary angioedema, which is characterized by a C1 inhibitor deficiency and demonstrated in July 11, 2012, lab work. (Doc. 15, at 13) (citing Tr. 360-61). She argues 14.06(A) is met because she suffers from swelling in more than two body systems, pain, and fatigue, which leaves her "unable to perform even routine daily activities, satisfying the at least moderate degree of severity required . . .". *Id.* (citing Tr. 51-52, 54). Plaintiff also argues her impairment meets the requirements of 14.06(B) because her condition causes swelling in her abdomen, genitals, hands, and feet; severe pain; fatigue; diarrhea; and nausea. (Doc. 15, at 13). She notes the frequency and severity of her symptoms affects her ability to perform daily activities. (Doc. 15, at 14) (citing Tr. 51-52, 54).

The Commissioner responds, "the ALJ's discussion of these factors in not limited to the two paragraphs in which she concludes that Plaintiff did not meet or equal the criteria of Listing 14.06" and proceeds to explain that elsewhere in her opinion the ALJ "discuss[ed] Plaintiff's medical history in detail—making clear that Plaintiff did not meet either the moderate or marked levels of severity of symptoms required to meet or equal the listing". (Doc. 17, at 8).

Indeed in *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006), the court stated the ALJ did not err when failed to "spell[] out every consideration that went into the step three determination" but analyzed all the evidence elsewhere in the opinion, and explicitly stated he considered all the claimant's impairments in finding they did not meet a listing. The court noted there is not a heightened articulation standard at Step Three. *Id.* However, recently, in *Harvey v. Comm'r*, No. 16-3266 (Mar. 6, 2017), the Sixth Circuit remanded the case where the district court looked elsewhere in an ALJ's opinion for Listing analysis and engaged in fact-finding. ("The district court should not have speculated what the ALJ may have concluded had he considered the medical evidence under the criteria in Listing 1.02.") *Id.* at 10.

Here, in contrast to *Bledsoe* and like *Harvey*, the undersigned does not find an explanation for the ALJ's Step Three analysis anywhere in the opinion. The ALJ's analysis within her Step Three determination is conclusory and offers no detailed explanation as to why Plaintiff's condition fails to meet or equal Listing 14.06, other than stating that it does not. She did not articulate the criteria of Listing 14.06 and evaluate the medical evidence under it. *See Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x 411, 416 (6th Cir.2011) (holding the ALJ erred in "failing to analyze Reynolds' physical condition in relation to the Listed Impairments."). Because the ALJ failed to analyze the medical evidence pursuant to the criteria of Listing 14.06, and Plaintiff cites to evidence in the record showing her condition could medically equal the Listing, the case must be remanded. *See Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir.2013) ("If, however, the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing.") (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir.1990)).

15

Thus, pursuant with *Harvey* and *Reynolds*, the ALJ's Listing analysis is insufficient and the undersigned recommends remand for consideration and explanation of whether Plaintiff's impairment satisfies the criteria of Listing 14.06. This error is not harmless because if Plaintiff meets the requirements for the Listing, she will be found disabled. *Reynolds*, 424 F. App'x at 416. ("The ALJ's error was not harmless, for the regulations indicate that if a person is found to meet a Listed Impairment, they are disabled within the meaning of the regulations and are entitled to benefits; no more analysis is necessary.") (citing 20 C.F.R. § 404.1520(a)(4)(iii)); *see also Risner v. Comm'r of Soc. Sec.*, 2012 WL 893882, at *5 (S.D. Ohio) ("The ALJ should, in the first analysis, assess whether the evidence put forth shows that Plaintiff meets or equals a Listing. Should he determine [he] does not, the ALJ must explain his decision with a discussion and analysis of the evidence.").

"While the Commissioner may ultimately be correct that [Plaintiff] does not suffer from a listing level impairment, this Court cannot make such a determination without an appropriate Step Three analysis." *Brown v. Comm'r*, 2013 WL 3873230, at *7 (N.D. Ohio).

<u>Treating Physician Rule</u>

Plaintiff next argues the ALJ's Step Four determination is not supported by substantial evidence because the ALJ violated the well-known treating physician ruling by not giving deference to the opinions of Robert Radin, M.D. (Doc. 15, at 15-23). The Commissioner responds the ALJ adequately provided "good reasons" for discounting the opinions. (Doc. 17, at 10-13).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Rule ("SSR") 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's]

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec*., 561 F.3d 646, 651 (6th Cir. 2009). The Sixth Circuit has held that an ALJ may also

give "good reasons" by challenging the supportability and consistency of the treating physician's opinion in an "indirect but clear way", *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010), or "implicitly provid[ing] sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little to no weight overall", *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006).

When an ALJ determines a treating physician's opinion is not entitled to controlling weight, she must provide support to refute either the opinion's objective basis or its consistency with other record evidence. *Gayheart*, 710 F.3d at 376-77. Conclusory statements in this regard, however, are not sufficient. *See Rogers*, 486 F.3d at 245-46 (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

Here, on October 10, 2014, Robert C. Radin, M.D., wrote the following letter addressed to Plaintiff's counsel, Attorney Rebecca Gillissie:

> Ms. Lanham suffers from a rare and potentially life threatening genetic condition called hereditary angioedema. It is characterized by a genetic defect in the production of inadequate or non-functioning Cl esterase inhibitor. This is a protein that helps regulate the body's inflammatory system. This patient suffers from severe attacks of abdominal pain caused by intestinal swelling. The pain is incapacitating and usually lasts more than a day or two. In between the attacks, the patient has low grade abdominal symptoms and fatigue. She has also suffered from facial and extremity swelling. One of the past attacks led to swelling of her tongue. These attacks are potentially life threatening if they extend into the larynx. When questioning the patient about the level of pain, she describes it as a 10/10 on the pain scale. It is also associated with nausea and vomiting. There is no cure for the disorder.

Due to the frequency and severity of the patient's symptoms, she has not been able to work. There are new treatments that have surfaced over the past two years. The treatments do not cure the disorder, but they do help to ameliorate the symptoms. Unfortunately, they do not make hereditary angioedema patients asymptomatic. For the reasons stated above, this patient is not employable.

(Tr. 449).

Four months later, on February 10, 2015, Dr. Radin wrote a second letter to Attorney Gillissie:

Ms. Lanham was seen in the office today for follow up of her hereditary angioedema. During my career, I have seen 45 patients with this disorder. I am currently managing approximately 20 patients. Some are able to work since they only have 2 or 3 attacks per year. Unfortunately, I have too many patients that are unable to work due to the frequency and severity of their attacks. I am familiar with 2 deaths from this disease.

She has tried Danazol which is an anabolic steroid used to treat or ameliorate the symptoms of hereditary angioedema. It has not stopped her attacks which involve abdominal swelling and pain with diarrhea. She has also experienced extremity and lip swelling. Since her last visit in October, she has had more than 20 attacks of angioedema where she had to use her rescue medication. The attacks are much worse around her menstrual cycle. She has been disabled up to 5 days with abdominal swelling and pain. Due to the severity and frequency of her HAE attacks, her work attendance would be less than 50%. Since there is no cure for her disorder, her only option is disability.

(Tr. 480).

With regard to these letters, the ALJ first stated: "Dr. Radin noted that the claimant had 'low-grade abdominal symptoms and fatigue' between attacks (Exhibit 10F)." (Tr. 23). First, she noted those symptoms did not support the claim that Plaintiff was unable to perform work consistently. *Id.* Second, she noted physical examinations "were consistently unremarkable (Exhibits 3F, 4F, 7F, and 11F)." *Id.* Third, the ALJ stated Plaintiff's symptoms "were generally relieved with medication (Exhibit 11F)." *Id.* Fourth, the ALJ noted Plaintiff reported performing "extensive activities of daily living including caring for her elderly mother, preparing meals, doing

laundry, and grocery shopping that are consistent with light work activity (Exhibit 5E and testimony)." *Id.* Fifth, the ALJ cited instances of inconsistences between Plaintiff's testimony and medical evidence in the record, ultimately finding her "not fully credible." (Tr. 23-24).

The ALJ then expanded upon Dr. Radin's opinions:

> On October 10, 2014, treating immunologist Dr. Robert Radin, M.D. noted that the claimant was unemployable due to the frequency and severity of her symptoms of hereditary angioedema (Exhibit l0F). This assessment is given no significant weight because the issue of the ability to work is reserved to the Commissioner and because Dr. Radin's statements are vague and are not supported by the medical evidence of record (20 CFR 404.1527, 416.927 and SSR 96-5p). The claimant reported that she had had three episodes in three years in June of 2014 (Exhibit 6F). There is no record of treatment for attacks or flares between June of 2013 and October of 2014 (Exhibits 6F, 7F, and 9F). Dr. Radin noted that the claimant had "low-grade abdominal symptoms and fatigue" between attacks (Exhibit 10F). However, these low-grade symptoms do not support a conclusion that the claimant could not perform any work on a consistent basis. On February 10, 2015, Dr. Radin noted that the claimant had had twenty attacks since her last visit in October that required her to use her rescue medication and that her work attendance would be less than fifty percent (Exhibit 14F). This letter is given no significant weight because there is no documentation of these supposed attacks and the claimant's medical history does not support this frequency of attacks (Exhibits 2F, 3F, 4F, 6F, 7F, and 9F) (20 CFR 404.1527, 416.927 and SSR 96-5p). This letter appears to be based on the claimant's subjective complaints, which are not fully credible (SSR 96-7p).

(Tr. 24).

Plaintiff argues the ALJ erred in her analysis of Dr. Radin's opinions because: 1) they are "wholly consistent with the evidence of record concerning the Plaintiff's symptoms and complaints[]"; and 2) the ALJ failed to provide "good reasons" for discounting the opinions. (Doc. 15, at 17). These arguments are not well taken.

First, the ALJ properly noted that Dr. Radin's opinion Plaintiff was unable to work was not entitled to deference. The regulations reserve the ultimate decision regarding disability to the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e); *see also* 20 C.F.R. § 404.1527(e)(3) (no "special significance" given to opinions about disability, even those by treating physician); *Brock*,

368 F. App'x at 625. Thus, the ALJ was justified in rejecting Dr. Radin's conclusion that Plaintiff was unable to work. (Tr. 30-31). Importantly, the final responsibility for determining a claimant's RFC "rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x. 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).

Second, the ALJ's reasoning for discounting the opinions speaks to the factors of supportability of the opinion and consistency of the opinion with the record as a whole. 20 C.F.R. § 404.1527(d)(2). Plaintiff points to other factors that seem to weigh in her favor, such as the specialization of the treating source; however, the ALJ is not required to explicitly discuss all of the factors. *Francis*, 414 F. App'x at 804-05; *Allen*, 561 F.3d at 651. And, the Court must "defer to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'" *Jones*, 336 F.3d at 475 (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997)).

Third, the ALJ's determination is supported by substantial evidence in the record. The alleged frequency of angioedema attacks Dr. Radin cites is not supported by the record and contradicted by Plaintiff herself. Indeed, in June 2013 she noted she experienced only three episodes in the three years prior. (Tr. 406). There are no medical records from August 2013 to June 2014, and there are no records after October 2014. Plaintiff appears to have had only two appointments with Dr. Radin. (Tr. 447-48). There is evidence of unremarkable physical examinations in the record. (Tr. 359, 369, 433-35). Plaintiff's symptoms were often alleviated with medication. (Tr. 346, 369, 414, 447, 451). There is also evidence supporting the ALJ's conclusion Plaintiff's daily activities did not support the alleged severity level of her symptoms. (Tr. 39, 40, 42, 52). Taken as a whole, this evidence supports the ALJ's determination Plaintiff's symptoms do not support an inability to work consistently.

Although Plaintiff points to other evidence in the record to support her position, this Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Thus, the undersigned finds the ALJ provided sufficient "good reasons" for discounting the opinion of Dr. Radin.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Court remand the case pursuant to sentence four for a detailed analysis of whether Plaintiff's impairments meet or medically equal the criteria of Listing 14.06.

 s/James R. Knepp, II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).